## Case No. 7,648.

### In re KEILER.

[18 N. B. R. 36; [1] 10 Chi. Leg. News. 299.]

District Court, S. D. Illinois. 1878.

BANKRUPTCY—COMPOSITION—OBJECTIONS—COLLUSION.

1. In composition proceedings. when objections are interposed by the minority, whose claims will be discharged against their will, it is the duty of the court to examine those objections fully and carefully.

2. The court will not hesitate to interfere when the debtor has deceived the creditors into a vote which they would not have given had the facts been honestly and fairly before them; nor to withhold its assent to the composition, if it is satisfied that the proceedings are collusive, although there is only one dissenting creditor. But the court must act on evidence, not suspicion.

[Cited in Re Keller. Case No. 7,654.]

3. Where it appears that the creditor can receive no more than the amount proposed if ordinary administration be had, and there is no adequate proof of collusion, the composition should be confirmed.

In bankruptcy.

TREAT, District Judge. Though suspicions are not proofs, yet if apparently resting on good grounds. should provoke careful scrutiny. There is great difference of practice and rulings upon the act of 1874 [18 Stat. 178], both as to involuntary and as to composition proceedings. Inasmuch as said act, unless the court proceeds thereunder with great circumspection, opens a wide door to fraud and collusion, this court has. in opposition to the views and practice of many other district courts. insisted upon more than formal action. When involuntary proceedings have been instituted, it has always required, despite the admission of the debtor, that an examination should be had to ascertain whether the requisite number of creditors joined in the petition. It is unnecessary to repeat the reasons so often expressed, for rigid adherence to that practice. As to compositions, it should, in the absence of any objection, be supposed that the creditors know their own interest best; but when objections are interposed by the minority whose claims may be discharged against their will, it is

1 [Reprinted from 18 N. B. R. 36, by permission.]

the duty of the court to examine those objections fully and carefully. Rather than be annoyed with litigation and dilatory proceedings, or from other causes, charitable or sympathetic, some creditors readily give their assent to propositions made, without scrutiny or hesitation. If no other creditors were involved, courts might, without interposition, permit them to decide for themselves what their own interests demand. But the act calls for the judgment of the court on the question, for the obvious reason that the minority need and are entitled to protection.

The first inquiry under the exceptions in this case pertains to the number, etc., of those voting for the resolution and attaching their confirmatory signatures. The register reports that the requisite number thus acted, even if the votes and signatures objected to were refused. Against that finding there is no satisfactory evidence. Whether it is for the best interests, etc., must depend upon the debts and assets. Two appraisements have been had whereby the visible assets have been ascertained. It is contended that the bankrupt's transactions for the past year indicate a larger amount of assets to be accounted for. It is certainly not very favorable to the bankrupt, that this books have not been kept in such a manner as to show on their face the precise nature of each and every business transaction. About a year ago he effected a composition, mainly on terms requiring indorsed paper. One of the objects of the composition was that his assets should be retained by him, out of which he could realize enough to meet his composition obligations. To secure his then creditors, he gave for time payments indorsed paper. Both his creditors and indorsers had a right to look to his then assets for their dues. The absorption of those assets in payment of the prior composition is not fully taken into account, nor the obligations of those indorsers. It may be that the act of congress is not sufficiently guarded in that respect. If the proposed composition is always to be in cash, how shall the bankrupt procure the means? The purpose is to learn the assets in his hands, out of which he may thereafter realize the means of paying what he proffers; and if he gives indorsers, the latter have a right to rely on said assets and his future gains. Were this not so, the composition section would be futile.

In this case the bankrupt, when he effected a composition about a year ago at 30 per cent. of his indebtedness, did so on condition of giving indorsers for time payments, and having his property turned over to him free from debts. He thus started anew with assets valued at $22,000 (in round numbers). As a large portion of the specific property then on hand was not sold at once, and as his purpose was to continue in business by adding thereto in the ordinary course of trade, each subsequent creditor could have readily

ascertained (for it was of record) how much he owed under his former composition, and what assets he had at the time to meet the same. They also could have known that, inasmuch as his prior debts were discharged, what was the extent of his new obligations by indorsement. It cannot be held that those indorsers were limited to old assets for their obligations; that if the maker of the notes did not pay the same at maturity, and the indorsers were consequently compelled to do so, they had no subsisting demands against him; or, in other words, that they were to be classed solely as debtors whose dues were as existing prior to the composition. It may be that a composition on payment by instalments, thus indorsed, leads to mischief in some cases; but if permissible, subsequent creditors are in no worse condition than when they sell or loan to a merchant without inquiring into the position of his affairs. Such indorsers are new creditors, and stand in the same condition as all other new or subsequent creditors, unless compositions, except for cash are to be rejected. Counsel on both sides have given the court their aid to the fullest extent in analyzing the present condition of the bankrupt's estate. The conclusion reached by the court after patient investigation is that the assets of the bankrupt can in no contingency realize to the unsecured creditors a larger sum than the terms offered. Ordinarily, that conclusion would be decisive of the case, for the courts have nothing to do with the policy or impolicy of statutory law; but they must decide what the law is, leaving it to the law-making power to enact what statute the legislative wisdom may dictate. It would be aside from the province of the courts to enter upon a discussion foreign to their functions.

A question remains concerning which decisions may not be in accord, viz.: To what extent the court will look behind the action of the creditors for the protection of their supposed interests, against their express will. This court has not hesitated to interfere when the debtor has deceived the creditors into a vote which they would probably not have given had the facts been honestly and fairly before them. It is charged in this case that the just inference from all the facts is, that the voting quorum is in collusion with the creditor, whereby the minority creditors will be compelled to take 15 per cent. of their demands, while the others, under some secret understanding, are to receive, eventually, a larger percentage, or even payment in full. It is on this point that the court has had most embarrassment—not on the legal proposition—but on the facts disclosed. If the court were satisfied that the proceedings were collusive, or fraudulent in the sense suggested, it would not hesitate to withhold its assent to the proposed action, although there was only one dissenting creditor, for the bankrupt act, in all its features, looks to equality of payments. The fact that the bankrupt did after his former compositions, pay some of its creditors in full, to the extent of $14,000, must have tended to cripple his resources largely for future operation. Subsequent creditors had a right to suppose that his then present assets and business would be applied solely to his legal obligations; for if those assets were to be applied to obligations discharged by the former composition, then such composition for business ends was a snare and a fraud. True, if all subsequent obligations were amply provided for, then out of his surplus it might have been commendable to pay what, except for the bankrupt act, he would have been legally bound to pay. It seems that most of the creditors signing this composition, signed the former one, and subsequently received from the bankrupt, payment in full, thus actually having had an advantage over others. Some of these creditors have been active in inducing others to sign the present composition. The evidence has failed to disclose that there is any positive understanding between them and the bankrupt, that they shall hereafter fare better than other creditors, although the case wears a very suspicious aspect, especially when much evasive testimony is examined. On the other hand, some of the dissentients are creditors who sought to procure an advantage by attachments, which they must lose if the administration in bankruptcy is obtained, as it must now, whatever may be the result of the pending motion. If the court could detect any direct or positive proof, or if it could infer within any recognized rules of evidence, that there was collusion in the case, it would promptly reject the composition; but courts must act on evidence, not suspicion.

In determining what is for the best interests of creditors under composition proceedings, it is a source of great difficulty to measure the probabilities as to varied litigation. It may be that if the ordinary course is pursued, the assignee might recover supposed preferences, the amount of which would swell the estate; yet all such disputes involve expensive litigation on doubtful questions, possibly at the expense of the creditors and all interested without increment to the estate. Hence, to save for the creditors the largest net amounts, courts have adjusted demands in dispute, thereby avoiding litigation and its attendant expenses, which not infrequently would have been largely more than the whole amount involved. Thus, if this case passes to the ordinary administration under assignment, it may be that many suits will have to be instituted concerning payments supposed to be improperly made, the outcome of which would be defeat or fruitless judgments. In view of such doubtful results, creditors may have voted whereby they have preferred a small amount at once received to a possible receipt of a larger amount after doubtful and protracted litigation.

Suppose the debtor has so acted as to be subject to just censure, shall the creditors agree to receive all that it is possible for them to acquire, or refuse to do so in order to inflict upon him what they consider just punishment? It must be remembered that in the present aspect of the case the court is dealing with the creditors and their debtor solely with regard to pecuniary interests. What will be the outcome of an assignment and administration thereunder? Has there been collusion to the injury of any creditor? It appearing that the creditors can receive no more than the amount proposed if ordinary administration is had, and there is no adequate proof of collusion, the exceptions will be overruled, and the composition ordered to be recorded, etc.

With a view to this investigation, three appraisers were appointed at the instance of the dissenting creditors, also an expert. It was the fault of the bankrupt that such action was necessary, hence that costs thereof will be taxed as part of the costs of this case. The accounts presented are exorbitant. Certainly three appraisers could perform the work themselves, without the aid of outside parties. Hence the accounts of Matthews and Selkirk will be rejected. Each of the appraisers will be allowed $100, and the expert $180, to be taxed as costs.